UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

LONNIE LADEAN KESTNER,

                     Petitioner,                         Case No. 1:08-cv-877

v.                                       Honorable Robert Holmes Bell

BLAINE C. LAFLER,

                     Respondent.

_____/

## REPORT AND RECOMMENDATION

        This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254. Petitioner is serving two terms of 9 to 40 years, imposed by the Berrien County Circuit Court on May 9, 2005, after a jury convicted Petitioner of operating or maintaining a methamphetamine lab, MICH. COMP. LAWS § 333.7401c(2)(f), and delivery or manufacture of methamphetamine, MICH. COMP. LAWS § 333.7401(2)(b)(i). In his original *pro se* petition, Petitioner raised twelve grounds for relief, as follows:

    I.      PETITIONER WAS DENIED HIS UNITED STATES CONSTITUTION, FIFTH, SIXTH, AND FOURTEENTH AMENDMENT RIGHTS TO PRESENT A DEFENSE, EQUAL PROTECTION, AND DUE PROCESS WHERE THE MICHIGAN COURT'S REFUSED TO GRANT PETITIONER AN EVIDENTIARY HEARING.

    II.     THE PETITIONER WAS UNLAWFULLY DEPRIVED OF THE EFFECTIVE ASSISTANCE OF COUNSEL WHEN TRIAL COUNSEL FAILED TO MOVE TO STRIKE PROSECUTION WITNESSES DOHNER, SHEELER, [P]ARKER, AND ZELMER.

    III.   THE TRIAL COURT DEPRIVED THE DEFENDANT OF HIS DUE PROCESS AND EQUAL PROTECTION RIGHTS TO A FAIR TRIAL

WHEN IT UNLAWFULLY ADMITTED OTHER-ACTS EVIDENCE, WHEN IT UNLAWFULLY PERMITTED THE PROSECUTOR TO COMMIT MISCONDUCT WARRANTING REVERSAL, AND WHEN IT UNLAWFULLY SCORED 10 POINTS ON OV-14.

IV.    CUMULATIVE EFFECT OF ERRORS BY THE PROSECUTOR DID VIOLATE MR. KESTNER'S CONSTITUTIONAL RIGHT TO A FAIR TRIAL, EQUAL PROTECTION, AND DUE PROCESS, WHEN SHE ENGAGED DEFENSE WITNESS AND MR. KESTNER INTO AN IMPROPER LINE OF QUESTIONING AND IN HER CLOSING ARGUMENTS EXPRESSED HER PERSONAL BELIEF IN THE SHAMEFULNESS, INTELLIGENCE, VULNERABILITY, MOTIVES TO LIE, TRUTHFULNESS, AND CREDI[]BILITY OF HER WITNESSES WHILE EXPRESSING HER PERSONAL BELIEF IN THE UNTRUTHFULNESS OF DEFENSE WITNESS AND MR. KESTNER.

V.    MR. KESTNER WAS DENIED HIS MICHIGAN AND U.S. CONSTITUTIONAL RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL WHEN HIS COURT APPOINTED ATTORNEY LABORED UNDER AN ACTUAL CONFLICT OF INTEREST AND REPRESENTED MULTIPLE CO-DEFENDANTS IN THE SAME PROCEEDINGS ON THE SAME OFFENSE.

VI.    THE TRIAL COURT DID DEPRIVE MR. KESTNER OF HIS CONSTITUTIONAL DUE PROCESS AND EQUAL PROTECTION RIGHTS TO A FAIR TRIAL WHEN IT PERMITTED THE JURY TO USE MR. KESTNER'S CHOICE TO REMAIN SILENT AT THE TIME OF HIS ARREST AS SUBSTANTIAL EVIDENCE AGAINST HIM DURING JURY DELIBERATIONS.

VII.    THE PROSECUTOR DID DEPRIVE MR. KESTNER OF HIS DUE PROCESS AND EQUAL PROTECTION RIGHTS TO A FAIR TRIAL WHEN SHE FAILED TO DISCLOSE PRIOR TO TRIAL ALL POLICE REPORTS THAT PERTAIN TO THE CASE, PHOTOGRAPHS, AND LETTERS PURPORTEDLY WRITTEN BY MR. KESTNER, OBSTRUCTING DEFENSE PREPARATIONS, AND SUBSEQUENTLY USING THE UNDISCLOSED INFORMATION DURING THE COURSE OF THE TRIAL.

VIII.    THE DEFENDANT WAS UNLAWFULLY DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL DURING "CRITICAL STAGES" OF THE CRIMINAL INVESTIGATIONS AND PROCEEDINGS AGAINST HIM.

IX.   THE TRIAL COURT DID DEPRIVE THE DEFENDANT OF HIS DUE
PROCESS AND EQUAL PROTECTION RIGHTS TO A FAIR TRIAL
WHEN IT UNLAWFULLY ADMITTED INTO EVIDENCE AN
EDITORIALIZED STATEMENT TAKEN AFTER THE DEFENDANT
HAD INVOKED HIS RIGHT TO REMAIN SILENT, REQUESTED
COUNSEL TO BE PRESENT BEFORE ANY FURTHER QUESTIONING,
AND FORMAL CHARGES HAD BEEN FILED, BY WAY OF
WARRANTS BEING ISSUED, AGAINST THE DEFENDANT.

X.   PETITIONER WAS DENIED HIS UNITED STATES CONSTITUTION,
SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF TRIAL
COUNSEL WHERE THE CUMULATIVE EFFECT OF TRIAL
COUNSEL[']S ERRORS DEPRIVED HIM OF HIS RIGHT TO COUNSEL,
DUE PROCESS & EQUAL PROTECTION.

XI.   PETITIONER WAS DENIED HIS UNITED STATES CONSTITUTION,
SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF
COUNSEL WHERE HIS APPELLATE COUNSEL DENIED HIM THE
MINIMUM ASSISTANCE MANDATED BY THE UNITED STATES
CONSTITUTION.

XII.   PETITIONER WAS DENIED HIS UNITED STATES CONSTITUTION,
FOURTH, FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENT
RIGHTS WHERE THE DISTRICT COURT LACKED SUBJECT MATTER
AND PERSONAL JURISDICTION TO ARREST AND CONVICT HIM OF
A CRIME UNDER THE COLOR OR APPEARANCE OF LAW, AND
WHERE THE CHARGING INSTRUMENT WAS FATALLY DEFECTIVE.

(Attachments E, G, H & I to Petition, docket #1, Page ID##32, 48, 51, 55-57, 59-61, 65, 67-68, 70.)

Respondent filed an answer to the petition (docket #22) stating that the grounds should be denied

because they are unexhausted, procedurally defaulted or have no merit.

On April 8, 2011, Petitioner filed a motion to supplement his habeas corpus petition

with three additional or supplemental issues.  (Docket #60.)  Petitioner represented that, since filing

his habeas petition, he had exhausted the three issues by appealing them to both the Michigan Court

of Appeals and the Michigan Supreme Court.  In an order issued September 28, 2011, the

undersigned granted the motion to supplement, subject to the Respondent's ability to raise any

applicable defense, including procedural default or the expiration of the statute of limitations.  The

three supplemental issues are as follows:

> I.  MR. KESTNER IS ENTITLED TO BE RESENTENCED WHERE, AT THE TIME OF SENTENCING, THE TRIAL COURT VIOLATED DUE PROCESS BY ENHANCING MR. KESTNER'S PRIOR RECORD VARIABLE SCORE (PRV) AND SENTENCE BASED UPON FALSE INFORMATION ALLEGING A PRIOR FELONY DRUG CONVICTION OUT OF FRANKFORT, KENTUCKY.

> II.  MR. KESTNER WAS DENIED HIS MICHIGAN CONSTITUTION 1963, ARTICLE 1, §§ 2, 17, 20, AND HIS FIFTH, SIXTH, AND FOURTEENTH AMENDMENT RIGHTS OF THE UNITED STATES CONSTITUTION WHERE TRIAL COUNSEL ABANDONED MR. KESTNER AT "CRITICAL STAGES" OF THE CRIMINAL PROSECUTION AGAINST HIM WHILE LABORING UNDER A CONFLICT OF INTEREST SIMULTANEOUSLY REPRESENTING MULTIPLE CODEFENDANTS AND WITNESSES AGAINST MR. KESTNER, BREACHING HIS DUTY OF LOYALTY CAUSING MR. KESTNER PREJUDICE.

> III.  MR. KESTNER WAS DENIED HIS MICHIGAN CONSTITUTION 1963, ARTICLE 1, §§ 2, 17, 20, AND HIS FIFTH, SIXTH, AND FOURTEENTH AMENDMENT RIGHTS OF THE UNITED STATES CONSTITUTION WHERE APPELLATE COUNSEL MISREPRESENTED THE ACTUAL FACTS OF THE CASE TO THE COURT OF APPEALS, RAISED FRIVOLOUS ARGUMENTS, FAILED TO PROVIDE THE COURT WITH THE READILY AVAILABLE AREAS OF THE TRIAL COURT RECORD THAT WOULD HAVE SUPPORTED THE ISSUES RAISED WITH MERIT, WHILE FAILING TO RAISE OTHER MERITORIOUS ISSUES IN A TIMELY MANNER.

(Supplement Br. in Supplement of Pet., docket #66, Page ID#897.)

Upon review and applying the AEDPA standards, I find that all of Petitioner's

grounds for habeas relief are procedurally defaulted, or are without merit.  Accordingly, I

recommend that the petition be denied.

**Proposed Findings of Fact**

**A.     Trial Court Proceedings**

The state prosecution arose from Petitioner's participation in methamphetamine-manufacturing activities between November 2004 and January 2005.  Petitioner was charged with one count of maintaining a methamphetamine (meth) lab and one count of delivery or manufacture of meth.  On March 8, 2005, Petitioner waived his right to a preliminary examination, and he was bound over to the circuit court on both counts.  Petitioner was tried before a jury beginning April 14, 2005, and concluding on April 18, 2005.

Before trial began, the prosecutor filed a motion to introduce evidence of other similar acts as evidence of a common plan, scheme or system.  On the opening day of trial, the trial court heard argument on the motion.  (Tr. I at 3-7, docket #36.)  The court granted the prosecution's motion to introduce the evidence, but agreed to provide a limiting instruction both at the time the evidence was admitted and before the jury began its deliberations.  (*Id.* at 7-9.)  Following jury selection, outside the presence of the jury, the court addressed defense counsel about the late disclosure to defense counsel of new evidence.  The court instructed counsel that it was allowing extra time during the lunch break to insure that the defense had sufficient opportunity to review the evidence and discuss it with his client.  (*Id.* at 121.)

Berrien County Detective Martin Kurtz testified that he had been with the Sheriff's Department for nearly ten years.  He worked with the Narcotics Unit, and he was a certified D.E.A. meth lab technician, which qualifies him to both dismantle meth laboratories and document evidence from those laboratories.  (*Id.* at 136-38.)  The court qualified Detective Kurtz as an expert in the area of manufacturing methamphetamine and meth laboratories.  (*Id.* at 139-40.)  According to Kurtz, two

methods exist for manufacturing meth:  the red P or red phosphorus method and the anhydrous

ammonia method.  (*Id.* at 140.)  The red P method utilizes red phosphorus, which can be recovered

from several sources, including the striker on the back of a pack of matches or the striker from a road

flare.  The amount of phosphorus on a match striker is very small, so it takes hundreds, if not

thousands, of strikers to produce enough red phosphorus.  (*Id.* at 141, 143.)  Both kinds of strikers

are placed in a solvent such as paint thinner, Coleman fuel, HEET, isopropyl alcohol, or acetone.

The container is then shaken until all of the red phosphorus comes off the matchbooks.  (*Id.* at 142-

43.)  Another step in the process is to obtain quantities of pseudoephedrine from decongestants such

as Sudafed.  The tablets are then ground in a mortar and pestle, and the ground powder is placed in

another solvent.  The ephedrine floats to the top as an oil.  (*Id.* at 144.)  Iodine and salt are then used

to cause the red phosphorus to be released as a gas into a bottle.  (*Id.* at 145-46.)  The gas is added

to the ephedrine mix, which bubbles and creates the methamphetamine.  The wet methamphetamine

is then heated to cook off the fluids.  (*Id.* at 146.)

   In sum, to produce meth by the red P method, a person requires matchbook or flare

strikers, solvent, tubing, a two-liter bottle or gas cans, a heat source, pseudoephedrine and iodine.

Kurtz testified that the D.E.A. reports no  legitimate reason for the possession of all materials.  (*Id.*

at 149.)

   Meth is used in many ways.  It may be snorted like cocaine.  It can be heated so that

the gas can be inhaled.  It can be heated to a liquid form for injection.  And it can be ingested orally.

(*Id.* at 147.)

   On January 13, 2005 at about 6:00 p.m., Kurtz and Undersheriff Chuck Heit were

called by the New Buffalo Police to assist Officers Killups, Lewis and Haskings in a search of 309

S. Whittaker Street, a single family dwelling with no garage.  (*Id.* at 150-51.)  The residence was rented by Timothy Sheeler.  (*Id.* at 151.)  When he arrived, the only occupants were Sheeler and his dog.  (*Id.* at 151-52.)  Sheeler allowed the officers into the residence and consented to a search of the entire house.  (*Id.* at 152, 154.)  Kurtz initially checked the house for other persons.  As he was checking the basement, Kurtz found an open trash can containing a large number of matchbooks with the striker plates missing.  He also noticed a strong chemical smell like turpentine or lacquer thinner. (*Id.* at 153.)  Kurtz determined that he had the waste products of a meth lab.  Kurtz contacted his supervisor, Richard Boyce, and requested assistance.  (*Id.* at 154.)  Narcotics Unit Detectives and meth techs Pam Hampton and James Zehm responded.  They found three 55-gallon garbage cans, which they dumped on the floor and searched, one at a time.  (*Id.* at 155-56.)  They found three different matchbook groups containing thousands of matchbooks, stained coffee filters (which are used to strain impurities), tubing, homemade funnels, pH test strips, used hypodermic needles, acetone cans, paper towels that had been used to filter, used latex gloves, empty bottles of HEET, Coleman fuel cans, a nut grinder, and iodine bottles.  Only the hypodermic needles were unnecessary to the manufacturing process.  (*Id.* at 158-59.)  Other officers interviewed Sheeler.  Within the next few days, Kurtz interviewed David Floyd (a/k/a David Shepherd, Little Dave, Little David), Lucille Rouse, William Marvin (a/k/a John Dohner).  During his interview with David Floyd on January 14, Kurtz first heard that Petitioner was involved in manufacturing methamphetamine.  (*Id.* at 170.)

On January 13, 2005, Kurtz went to Dohner's house, which was located next door at 311 S. Whittaker St., but no one was at home.  (Tr. 161-63.)  Kurtz came back with Detective Zehm and interviewed Dohner on January 25, 2005.  (*Id.* at 163.)  They were given permission and searched the home, but every room was empty and clean.  (*Id.* at 164.)  On February 17, 2005, Kurtz

learned from New Buffalo Police Officer George Knoll that Petitioner, his brother Christopher Kestner, and David Floyd were operating a meth lab at 4722 Sawyer Road in Sawyer.  (*Id.* at 166-67.)  When Kurtz arrived at the address, Michelle Parker was at home.  She consented to a search.  (*Id.* at 167-68.)  Kurtz located a Rubbermaid container and two backpacks containing Coleman fuel and other meth production materials, such as rubber hosing, funnels, and an electric hotplate.  (*Id.* at 168-69.)  After interviewing Parker, Kurtz sought an arrest warrant for Petitioner.  (*Id.* at 170.)

Petitioner was arrested on the warrant in Michigan City, Indiana.  (*Id.* at 165.)  On February 18, 2005, Kurtz interviewed Petitioner in Michigan City.  Petitioner refused to waive his *Miranda* rights and declined to make a statement.  (*Id.* at 172.)  Subsequently, when Kurtz was handcuffing Petitioner and inspecting Petitioner's arms for drug use, Petitioner spontaneously made a statement.  (*Id.* at 173.)  Defense counsel objected to the line of questioning and Kurtz's answer, and the court excused the jury to take up the argument.  (*Id.* at 173.)  Kurtz testified outside the presence of the jury that, while Kurtz was examining Petitioner's arms, Petitioner stated that he had been an addict all his life.  Kurtz suggested that Petitioner should seek help.  Petitioner responded that he was 38 years old with a baby on the way, and it was too late, as his life was ruined.  (*Id.* at 177.)  Defense counsel argued that the statement was inadmissible because it had been induced by Kurtz's conduct.  He also argued that the statement was irrelevant to whether Petitioner's addiction was to meth or whether he was involved in the manufacture of meth.  (*Id.* at 177-78.)  The court overruled Petitioner's objections and ruled that it would admit the statement about Petitioner's life-long addiction.  (*Id.* at 179.)  The prosecution indicated that it intended to introduce further statements by Petitioner made during booking at the Berrien County Jail later that day.  At the time Petitioner was booked, officers recovered $1,400.00 in cash from Petitioner.  (*Id.* at 181.)  Kurtz

asked Petitioner a series of booking questions and questions relevant to civil forfeiture of the $1,400.00.  Following the offer of proof and argument, the prosecutor withdrew her attempt to introduce the statements made at booking and advised that she intended to introduce only the amount of money recovered on Petitioner's person.  (*Id.* at 185.)

When the jury returned, Kurtz testified that Petitioner had needle marks in his arm and stated that he had been an addict all his life.  According to Kurtz, Petitioner had in his possession over $1,300.00 in small bills and a cell phone.  (*Id.* at 187.)

John Dohner testified that, in late 2004, he lived at 311 Whittaker Street in New Buffalo.  Dohner was friends with Timothy Sheeler, who lived at 309 South Whittaker.  Dohner's girlfriend, Lucy Rouse, lived with him.  (*Id.* at 206.)  Petitioner began to stay overnight at Dohner's house, off and on, sometime after Thanksgiving of that year.  (*Id.* at 207.)  Petitioner worked with Dohner at the same construction company, beginning in September or October.  (*Id.* at 208.)  The house had eight bedrooms, but Petitioner did not stay in any of them, and Dohner never actually saw Petitioner sleep.  (*Id.* at 212, 215.)  Other people began visiting Petitioner during the night.  A short time later, Petitioner's brother Chris Kestner (Cricket) began staying at the house because he was kicked out of his girlfriend's house.  (*Id.* at 214, 216-17.)  Shortly before Christmas, Petitioner stopped staying with Dohner.  (*Id.* at 216.)

A number of times during Petitioner's stay, Dohner saw Petitioner in a room in the basement that Dohner had fixed up to be his carpentry workspace.  (*Id.* at 220-21.)  At various times, Petitioner was tinkering with bottles, jars, hoses and chemicals.  Petitioner told Dohner that he was making methamphetamine and gave Dohner some of it.  (*Id.* at 222.)  Dohner also saw Chris Kestner and Lucy Rouse in the room partying.  On one occasion, he saw Tim Sheeler.  (*Id.* at 223.)  He did

not ever remember seeing David Shepherd, also known as David Floyd.  (*Id.* at 235, 262.)  Dohner became very worried, knowing that Petitioner was doing something illegal.  After using meth a couple of times, he quit, but he could not get his girlfriend to stop.  Petitioner regularly left a mess, which Dohner cleaned up.  Dohner found hundreds of matches, pH strips and empty pill blister packs.  (*Id.* at 224, 231-32.)  Finally, he told Lucy and the others to leave and screwed the doors shut so that the others could not come in.  (*Id.* at 224-25.)  Chris moved over to Tim Sheeler's house for awhile, and began doing the same thing there.  (*Id.* at 230.)  Petitioner was the one who gave meth to Dohner, and Dohner saw both Petitioner and Chris give meth to Lucy.  (*Id.* at 235.)  Dohner testified that he was charged with maintaining a meth lab, but he was permitted to plead guilty to a less serious offense, under which he could go to prison for ten years.  Part of the plea agreement was his promise to testify truthfully against Petitioner.  (*Id.* at 238.)  On cross-examination, Dohner acknowledged that he originally lied to police by denying that he had seen meth being manufactured in his basement. (Tr. II at 245.)  Defense counsel also extensively cross-examined Dohner about his motive to lie to obtain a plea bargain, as well as other inconsistencies in his testimony.  (Tr. II, 249-59.)  During redirect examination, Dohner mentioned having been represented at one time by Petitioner's attorney.  (*Id.* at 272.)  The court read a stipulated instruction, informing the jury that Petitioner's attorney had met with Dohner on one occasion at the jail.  At the time, defense counsel believed he was going to be representing Dohner, Sheeler and Petitioner.  When defense counsel discovered there was a conflict of interest between the defendants, he promptly terminated his involvement with Dohner and Sheeler.  (*Id.* at 275.)

The prosecutor next called Timothy Sheeler.  Sheeler met Petitioner when Petitioner worked for Quality Construction and Sheeler worked for a roofer.  (*Id.* at 288-89.)  In November and

December of 2004, Sheeler lived at 309 South Whittaker, next door to John Dohner.  (*Id.* at 289-90.)
Dohner worked at Quality Construction, too, but Sheeler had known Dohner his whole life.  They
were friends and spent time in each other's houses.  (*Id.* at 290.)  Sheeler knew Petitioner stayed over
at Dohner's house for awhile because Petitioner was having trouble with his wife.  Sheeler saw
Petitioner's truck in the mornings on occasion.  (*Id.* at 292.)  Chris Kestner also stayed over at
Dohner's house a few times.  (*Id.* at 294.)  Eventually, Chris Kestner started staying at Sheeler's
house.  (*Id.* at 295.)  In addition, Chris's friend, David Floyd, came to stay at Sheeler's house.  (*Id.*
at 297.)  Sheeler never saw Floyd at Dohner's house.  (*Id.* at 297-98.)  Petitioner came over to visit
and stayed occasionally.  (*Id.* at 298-99.)  Sheeler saw Petitioner sitting with Chris at a table in the
basement of Sheeler's house on numerous occasions.  At some point, they hung a blanket to create
some privacy.  Sheeler knew that they were using a microwave a lot, and he saw lots of matches, a
couple of acetone cans, some two liter bottles, and some iodine bottles.  (*Id.* at 301-03.)  He knew
Petitioner and his brother were packaging meth in his basement.  (*Id.* at 303-04.)  He would go
downstairs to get meth from Petitioner and his brother, and then would go back upstairs.  (*Id.* at 304-
05.)  Sheeler saw Petitioner using the microwave, scraping a plate to give Sheeler meth off it,
handling plastic liter bottles, and other things.  Petitioner and his brother gave Sheeler meth because,
when Chris moved in, Sheeler told him he could stay as long as Sheeler got his fix.  At the time,
Sheeler was addicted to meth.  (*Id.* at 305.)  He had become addicted when he tried it over at
Dohner's house, and from December to January 2004, he injected meth approximately five times
each day.  (*Id.* at 306-07.)  When he was using meth, he would have great energy and would not need
to sleep for days at a time.  (*Id.* at 307-08.)  Sheeler never saw Petitioner sleep.  (*Id.* at 308.)

Sheeler began to get nervous because of the traffic of people leaving his house at 2:00 or 3:00 a.m., some of whom had been stopped by police.  (*Id.* at 315.)  He told Chris that he had to leave, and everyone left shortly thereafter.  (*Id.* at 316.)   Sheeler had kicked out Petitioner, Chris Kestner and Dave Floyd two weeks before his house was raided.  (*Id.* at 330.)  After they left, Sheeler tore down the sheet in the basement.  At that time, Sheeler had five garbage cans in his basement, filled with garbage that was in the house when Sheeler moved in.  He would take out a couple of cans for pickup each week so that he did not have to pay for a dumpster.  He did not look to see whether Chris and the others left any meth waste materials in his garbage cans.  (*Id.* at 317-18.)  Sheeler typically was given his meth by Petitioner or Chris at the kitchen table upstairs or in the yard.  (*Id.* at 321.)

When Sheeler was arrested at his home on January 13, 2004 he was interviewed by Detective Zehm.  Sheeler told Zehm that he had someone staying in the back room, but he did not recall mentioning Petitioner or Chris that day.  Sheeler stated that he did not say much to Zehm, and he acknowledged that he was trying to minimize his own involvement that day.  (*Id.* at 322-23.)  On February 18, Sheeler was interviewed by Detective Kurtz at the New Buffalo Police Department. He told Kurtz that he was not going to get in trouble for what someone else had done.  (*Id.* at 324-25.)  Sheeler told Kurtz that Petitioner, Chris, and Dave Floyd had been in his basement.  (*Id.* at 325-26.)  Sheeler testified that he had pleaded guilty to one meth offense in exchange for having two other offenses dismissed.  As part of his plea agreement, Sheeler agreed to testify truthfully against Petitioner.  (*Id.* at 328.)

Michelle Lynn Hollihan, formerly known as Michelle Parker, testified that she met Petitioner through his cousin, David Floyd, with whom she grew up.  (*Id.* at 345-46.)  She met

Petitioner for the first time on the day before the police came to her house.  (*Id.*)  He came to her house with David Floyd and Chris Kestner.  (*Id.* at 347.)  Dave and Chris had come over at about 5:00 or 6:00 p.m.  Chris asked if he could go into her bedroom to sleep, and she agreed.  Dave left a few hours later and came back with Petitioner.  (*Id.* at 348.)  They were carrying two duffel bags and a large plastic storage bin, which they carried into the bedroom.  (*Id.* at 350-51.)  She had no idea what was in the storage bin, and she was not concerned because Dave had asked her the day before if he could store his clothes and things at her house and if he could stay a couple of nights.  (*Id.* at 351.)  She was present in the bedroom for a few minutes while Dave began hanging up some clothes. Petitioner carried in the rest of the items.  (*Id.* at 352.)  During this time, Chris was asleep on the bed. Hollihan did not see anyone open the storage bin.  After she left the room, the door was shut and locked.  (*Id.* at 353.)  Hollihan reported that she had stopped using meth five months previously, but she became hooked on meth again during the three weeks Dave and Chris were around, which happened sometime after New Year's Day.  (*Id.* at 354-55.)  She started using meth heavily, three to four times a day.  Dave gave her the meth, and she assumed that it was in exchange for staying at her house.  (*Id.* at 356.)  On the evening of the day after Dave and Petitioner dropped off the bins and bags, Detective Kurtz and George Knoll came to Hollihan's door.  (*Id.* at 363.)  She led them through the house, but she was in the kitchen when they opened the bin and backpack.  She gave Detective Kurtz the meth that Dave had given to her.  (*Id.* at 363.)  Hollihan testified that her memory of the day Petitioner and Dave came to the house was less than perfect, as she had used meth before they came.  (*Id.* at 365.)  After talking to Kurtz and Knoll for an hour and a half, Hollihan checked herself into a drug treatment program.  (*Id.* at 366.)  Hollihan knew that Dave intended to "finish off" the meth at her house.  (*Id.* at 369-70.)  She testified that she had not yet been

charged for allowing her house to be used to manufacture meth, though she had been advised by the prosecutor that she could still be charged.  (*Id.* at 371.)

Following Hollihan's testimony, the court instructed the jury that Petitioner was not on trial for the incidents involving Hollihan and that they could consider Hollihan's evidence only to decide whether, in the matters for which he was on trial, Petitioner "knew or had reason to know that any place, equipment, or chemical in his possession was to be used to manufacture methamphetamine."  (*Id.* at 374-75.)

Berrien County Sheriff's Detective Pamela Hampton, another member of the Narcotics Unit and a certified meth technician, participated in the search of Timothy Sheeler's home with Detectives Kurtz and Zehm.  She tabulated and packaged the seized evidence and took pictures. (*Id.* at 376-78.)   In one of the basement garbage bins, they found Heet bottles, Coleman fuel, matchbook covers, pop bottles converted to funnels, coffee filters with residue, and latex used in the manufacturing process.  (*Id.* at 380.)  In the northeast bedroom upstairs, they found pseudoephedrine packets, 12-ounce bottles of iodine, a spoon with meth residue, two glass pipes, a couple of plates with residue, and pH strips.  (*Id.* at 381, 385.)  In the other bedroom, they found two glass pipes and a spoon with cocaine residue.  (*Id.* at 382, 385.)  A small amount of marijuana was found in one of the trash bags.  (*Id.* at 386.)

David R. Zelmer testified that he worked at the Buchanan Feed Mill.  Zelmer identified Petitioner as someone who had come into the store on a half-dozen occasions in the second half of 2004.  (*Id.* at 392-94.)  On each occasion except the last, Petitioner bought four or five pint bottles of seven-percent iodine.  On the last occasion, which was around Christmas, Petitioner bought more than twenty bottles.  (*Id.* at 394-95.)  According to Zelmer, the store did not sell much

seven-percent iodine like Petitioner bought; typically they sold a one-percent solution for surgical applications on animals.  (*Id.* at 396.)

Chief Berrien County Forensic Analyst Dewey Murdick identified his laboratory report on the items submitted by the detectives.  (*Id.* at 406.)  He testified as to why the many items were not tested for fingerprints.  (*Id.* at 409.)  He also testified that a seven-percent solution of iodine would burn the skin.  (*Id.* at 422.)

Berrien County Sheriff's Detective James Zehm testified that he also worked in the Narcotics Unit and had certification in dismantling meth labs.  (*Id.* at 424-25.)  Zehm testified about what items he found at Hollihan's house that were consistent with meth production: a plate with meth residue and an envelope with methamphetamine, as well as fitted mason jars, a heat plate, Coleman fuel, acetone, muriatic acid, coffee pots, pseudoephedrine packets and matchbook striker plates.  (*Id.* at 427-31.)  The court again instructed the jury on the limited purpose for which Zehm's testimony could be used:  that Petitioner had reason to know that any place, equipment or chemical in his possession was to be used to manufacture meth.  (*Id.* at 435.)  The prosecution rested.  (*Id.* at 439.)

The defense called Chris Kestner as its first witness.  Chris moved from Kentucky to Michigan in October of 2004, staying with Petitioner and Petitioner's wife in La Porte, Indiana for a couple of weeks.  Chris testified that Petitioner asked him to move out because he suspected Chris was manufacturing meth.  Chris eventually moved in with John Dohner just after Thanksgiving.  (*Id.* at 445, 447, 454, 465-66, 472.)   Both Chris and Petitioner worked on and off for Quality Construction.  Chris testified that he had pleaded guilty to manufacturing meth or maintaining a meth lab, the same charges Petitioner faced.  (*Id.* at 446-47.)  Chris testified that he

had known how to manufacture meth for a few years, before he moved to Michigan. He manufactured meth at Dohner's residence one time before he moved in. (*Id.* at 450-51.) After he moved into Dohner's house, he made meth on a number of occasions, but he cannot remember the exact number. The participants in the manufacturing process were always the same: Tim Sheeler, John Dohner, David Floyd and Chris Kestner. (*Id.* at 452.) Chris denied that Petitioner had ever been present when Chris made meth at Dohner's house. According to Chris, Dohner wanted to learn how to make meth and was a major participant in the manufacturing process. Dohner would punch out pills, cut matches, and watch the meth cook. Dohner was always present, but Sheeler was not there on all occasions. (*Id.* at 453.) David Floyd was Chris's cousin, and Chris taught Floyd how to make meth. Chris made meth strictly for his own consumption and that of the other participants. (*Id.* at 454-55.) Chris injected meth into both Dohner and Sheeler. (*Id.* at 456-57.) Chris also testified that he went to the Buchanan Feed Mill several times to purchase iodine for use in meth manufacturing. (*Id.* at 458.) On one occasion, Chris asked Petitioner to pick up iodine for him, but he told Petitioner it was for use on Chris's arm, where he had developed a bad injection site. On that one occasion, Petitioner bought two cases of seven-percent iodine. (*Id.* at 459, 497-98.) Chris denied that Petitioner was ever present while meth was being manufactured. (*Id.* at 459.) Once Dohner knew how to make meth, Dohner became suspicious of Chris's relationship to Dohner's girlfriend, Lucy. Dohner kicked Chris out of the house, and Chris moved next door to Sheeler's house. (*Id.* at 480.) On cross-examination, Chris acknowledged that, outside the area of carpentry, Dohner had limited intelligence. (*Id.* at 481-82.) But he theorized that Dohner made up the story about Petitioner because he believed Petitioner knew about a relationship between Chris and Lucy. (*Id.* at 484.) Chris also theorized that Tim Sheeler made up the story about Petitioner being at his

house because Sheeler and Petitioner did not get along as children. (*Id.* at 495.) Chris denied the prosecutor's allegation that Chris had told the probation officer three weeks previously that Chris had taught Petitioner to make meth and that Petitioner was part of the manufacturing done at Dohner and Sheeler's houses. (Tr. III, 531-32.)

Petitioner's wife, Tracy Kestner, testified that she had been married to Petitioner for thirteen years and they had three children. (Tr. III, 520.) According to Tracy, Chris lived with Petitioner and her from July to October 2004. They asked him to leave because they found a large quantity of matches in Petitioner's truck, which Chris had borrowed. (*Id.* at 522-23.) Petitioner was never away from home overnight. (*Id.* at 524.)

Petitioner testified that he was an independent contractor master carpenter who worked primarily with Quality Construction. (*Id.* at 536-37.) In the summer of 2004, Chris called Petitioner from Kentucky. Chris had been hooked on meth for four or five years. He had just gotten out of jail and asked if he could come stay with Petitioner in La Porte, Indiana. (*Id.* at 538.) After discussions with his wife, Petitioner agreed to give his brother a chance. Petitioner also arranged a job for Chris at Quality Construction. (*Id.* at 538.) Chris was well behaved for awhile, and Petitioner and his wife began to let Chris use their cars. (*Id.* at 539.) One day, Petitioner's wife found 30 packs of pseudoephedrine in the glove box of Petitioner's truck. Petitioner and his wife told Chris he had one more chance. About two weeks later, they found about 65 boxes of matches in the back of the truck after Chris had used it. They asked Chris to leave at the beginning of October. (*Id.* at 540.) Petitioner categorically denied that he moved into Dohner's home or that he manufactured meth at Dohner's or Sheeler's houses. (*Id.* at 541.) Petitioner testified that he had struggled with addiction to crack cocaine from the time he was 24 years old until he was 31 or 32

years old.  (*Id.* at 541-42.)  He knew that Chris lived with Dohner for a period of time and later with

Sheeler.  He visited Chris on about four occasions while Chris lived with Dohner.  (*Id.* at 544.)

Petitioner testified that he had $1,397.77 in his possession at the time of his arrest.  It was common

for him to carry such sums because he was an independent contractor.  (*Id.* at 545-46.)  Petitioner

denied ever having sold any type of drug and denied having given any meth to Dohner or Sheeler.

(*Id.* at 546.)  Petitioner went to Michelle Parker's (Hollihan's) house one time two days before he

was arrested.  David Floyd had called to ask him to bring groceries.  He brought things Chris would

eat, such as two-liter bottles of pop, candy bars, potato chips, and bologna, together with six packs

of cigarettes.  (*Id.* at 547-48.)  Petitioner admitted to buying iodine at the Buchanan Feed Mill on

four to six different occasions.  He used the iodine mostly to create his own furniture stain.  (*Id.* at

548-49.)   On cross-examination, Petitioner acknowledged that he had written letters to the

prosecutor, in which he claimed that the money in his possession at the time of the arrest was from

his wife's income tax refund.  (*Id.* at 559.)

On rebuttal, the prosecution called Mark Carpenter, an employee of the Michigan

Department of Corrections charged with preparing Chris Kestner's Presentence Investigation Report.

According to Carpenter, Chris told Carpenter that Petitioner helped Chris to set up two meth labs

in New Buffalo.  Chris also told Carpenter that Chris had taught Petitioner how to manufacture meth.

(*Id.* at 577-78.)

At the conclusion of trial, on April 18, 2005, the jury found Petitioner guilty of

maintaining a methamphetamine laboratory and guilty of manufacturing methamphetamine.  (Tr. III,

631.)  On May 9, 2005, Petitioner was sentenced to serve two consecutive prison terms of nine to

forty years.  (Sentencing Transcript (S. Tr.), 15, docket #39.)

- 18 -

B.      **Direct Appeal**

Petitioner appealed as of right to the Michigan Court of Appeals.  His brief, which was filed by counsel on March 3, 2006, raised four issues, the first and second of which roughly correspond with Grounds II and III (and part of Ground IV) of the petition for habeas corpus relief. (*See* Def.-Appellant's Br. on Appeal, docket #25.)  The remaining two grounds involved issues not presented in the habeas petition:  (1) that the trial court improperly relied on an uncounseled felony in sentencing petitioner; and (2) that sentencing for two terms of 9 to 40 years amounted to double punishment violating the United States and Michigan Constitutions.  Counsel also filed a motion to remand on the issue of ineffective assistance of counsel, which was denied by the Michigan Court of Appeals on April 6, 2006.  (*See* 4/6/06 Mich. Ct. App. Ord., docket #25.)  Original appellate counsel withdrew at Petitioner's request, and, on March 23, 2006, a second attorney was appointed. Petitioner attempted to file a *pro per* supplemental brief, which was untimely, and counsel failed to seek an extension for good cause.  Thereafter, Petitioner again sought the appointment of substitute counsel, and the trial court appointed the State Appellate Defender Office as counsel on September 25, 2006.  A month after third substitute counsel was appointed, Petitioner filed a *pro per* motion for new trial in the trial court.  On December 7, 2006, the trial court denied Petitioner's motion on the grounds that he could not simultaneously be represented by counsel and represent himself.  On December 22, 2006, appellate counsel filed a motion in the court of appeals to extend the time for filing a Standard 4 *pro per* supplemental brief, which was denied on January 5, 2007.  In the interim, on December 29, 2006, counsel filed a second motion to remand on the use of the uncounseled felony to enhance Petitioner's sentence, together with a motion to file a supplemental brief on appeal.  The court granted counsel's motion to file a supplemental brief and accepted the brief for

filing on January 11, 2007.  The court denied the second motion to remand on February 1, 2007.  In

the supplemental brief on appeal, counsel raised  five issues:

I.     WHERE SEPARATE AND DISTINCT ACTS COULD SUPPORT A
       GUILTY VERDICT ON BOTH THE MAINTAINING A METH LAB
       COUNT AND THE MANUFACTURING METHAMPHETAMINE
       COUNT, THE FAILURE TO GIVE A SPECIAL UNANIMITY
       INSTRUC[TI]ON VIOLATED MR. KESTNER'S RIGHT TO A
       UNANIMOUS VERDICT.

II.    THE TRIAL COURT ERRONEOUSLY ADMITTED THE PRIOR
       INCONSISTENT STATEMENTS OF CHRISTOPHER KESTNER
       WITHOUT LIMITING THE JURY'S CONSIDERATION OF THE
       STATEMENT TO A NON-HEARSAY PURPOSE, THEREBY
       DEPRIVING LONNIE KESTNER OF A FAIR TRIAL.

III.   MR. KESTNER RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL
       WHERE HIS ATTORNEY FAILED TO REQUEST A SPECIAL
       UNANIMITY INSTRUCTION ON THE MULTIPLE ACTS EVIDENCE
       PRESENTED AT TRIAL.

IV.    THE TRIAL COURT ERRONEOUSLY SCORED 10 POINTS FOR OV 14
       IN THE ABSENCE OF SUFFICIENT EVIDENCE TO SHOW THAT MR.
       KESTNER WAS THE LEADER IN A MULTIPLE OFFENDER
       SITUATION.

V.     THE TRIAL COURT VIOLATED DUE PROCESS BY ENHANCING MR.
       KESTNER'S SENTENCE BASED ON A PRIOR UNCOUNSELED
       FELONY CONVICTION.   ALTERNATIVE, REMAND FOR A
       TUCKER/MOORE HEARING IS REQUIRED.

(Supp. Br. on App., docket #25.)  On May 2, 2007, appellate counsel again filed a motion to extend

time to file a Standard 4 *pro per* supplemental brief on appeal, which was again denied on May 9,

2007.  In a lengthy unpublished opinion issued on May 22, 2007, the Michigan Court of Appeals

rejected all appellate arguments and affirmed Petitioner's convictions and sentences.  (*See* 5/22/07

Mich. Ct. App. Op. (MCOA Op.), docket #25.)

Petitioner filed a *pro per* application for leave to appeal to the Michigan Supreme Court on June 11, 2007. Petitioner raised the first two issues presented by his first appellate attorney, together with the four claims he attempted to raise in his Standard 4 *pro per* supplemental brief on appeal in the Michigan Court of Appeals:

I.     CUMULATIVE EFFECT OF ERRORS BY THE PROSECUTOR DID VIOLATE MR. KES[T]NER'S CONSTITUTIONAL RIGHT TO A FAIR TRIAL, EQUAL PROTECTION, AND DUE PROCESS WHEN SHE ENGA[]GED DEFENSE WITNESS AND MR. KESTNER INTO AN IMPROPER LINE OF QUESTIONING AND IN HER CLOSING ARGUMENTS EXPRESSED HER PERSONAL BELIEF IN THE SHAMEFULNESS, INTELLIGENCE, VULNERABILITY, MOTIVES TO LIE, TRUTHFULNESS, AND CREDIBILITY OF HER WITNESSES WHILE EXPRESSING HER PERSONAL BELIEF IN THE UNTRUTHFULNESS OF DEFENSE WITNESS AND MR. KES[T]NER.

II.    MR. KESTNER WAS DENIED HIS MICHIGAN AND U.S. CONSTITUTIONAL RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL WHEN HIS COURT APPOINTED ATTORNEY LABORED UNDER AN ACTUAL CONFLICT OF INTEREST AND REPRESENTED MULTIP[LE] CO-DEFENDANTS IN THE SAME PROCEEDINGS ON THE SAME OFFENSE.

III.   THE TRIAL COURT DID DEPRIVE MR. KESTNER OF HIS CO[NS]TITUTIONAL DUE PROCESS AND EQUAL PROTECTION RIGHTS TO A FAIR TRIAL WHEN IT PERMITTED THE JURY TO USE MR. KESTNER'S CHOICE TO REMAIN SILENT AT THE TIME OF HIS ARREST AS SUBSTANTIAL EVIDENCE AGAINST HIM DURING JURY DELIBERATIONS.

IV.    THE PROSECUTOR DID DEPRIVE MR. KES[T]NER OF HIS DUE PROCESS AND EQUAL PROTECTION RIGHTS TO A FAIR TRIAL WHEN SHE FAILED TO DISCLOSE PRIOR TO TRIAL ALL POLICE REPORTS THAT PERTAIN TO THE CASE, PHOTOGRAPHS, AND LETTERS PURPORTEDLY WRITTEN BY MR. KESTNER, OBSTRUCTING DEFENSE PREPARATIONS, AND SUBSEQUENTLY USING THE UNDISCLOSED INFORMATION DURING THE COURSE OF THE TRIAL.

- 21 -

(*Pro Per* Supp. Br. on App., docket #26.)  Petitioner also filed a motion to remand on August 29,

2007.  By order entered September 10, 2007, the Michigan Supreme Court denied the motion to

remand and denied Petitioner's application for leave to appeal because it was not persuaded that the

questions presented should be reviewed.  (*See* Mich. Ord., docket #26.)

### C.    Post-conviction relief

Petitioner filed a motion for relief from judgment in the Berrien County Circuit Court

on March 17, 2008, raising ten grounds corresponding with habeas grounds IV, V, VI, VII, VIII, IX,

XI, XII, and XIV, as well as one issue not presented on habeas review.  The trial court denied the

motion on procedural grounds because Petitioner had failed to demonstrate either actual innocence

or good cause and actual prejudice for his failure to raise the claims on direct appeal.  (4/30/08 Cir.

Ct. Ord., docket #1, Page ID##3-4.)  The court concluded that Petitioner's claim of ineffective

assistance of appellate counsel could not serve as cause excusing his procedural fault because

appellate counsel was not ineffective in declining to raise the issue of trial counsel's conflict of

interest because Petitioner could show neither actual conflict nor prejudice.  (*Id.*)  Petitioner moved

for reconsideration, arguing that the court had failed to address certain issues.  In an order issued

June 19, 2008, the court denied the motion.  (6/19/08 Cir. Ct. Ord., docket #1, Page ID##39-42.)

In the order denying reconsideration, the court rejected the claim raised as Petitioner's

twelfth ground for habeas relief, in which Petitioner argued that the trial court lacked jurisdiction

over him because the information and subsequent documents named him using capital letters as

"LONNIE LADEAN KESTNER," a supposedly fictitious person under law.  (*Id.* at 39-41.)  The

court also expanded its analysis rejecting the claim of ineffective assistance of counsel based on a

- 22 -

conflict of interest.  (*Id.*)  Petitioner did not seek leave to appeal from the April 30, 2008 or June 19, 2008 orders to either the Michigan Court of Appeals or the Michigan Supreme Court.

On April 28, 2008, Petitioner filed a complaint for habeas corpus relief in the Montcalm County Circuit Court, raising claims regarding the trial court's jurisdiction, defects in the charging document, and improper enactment of the statute.  Petitioner did not renew his habeas complaint in either the Michigan Court of Appeals or the Michigan Supreme Court.  (Pet., Page ID#4.)

On October 6, 2009, Petitioner filed a motion for relief from a void judgment in the Berrien County Circuit Court.  The court denied the motion.  (*See* 5/21/10 Cir. Ct. Ord., docket #66-1, Page ID##949-50.)  On December 14, 2009, Petitioner filed another motion for relief from judgment, which the court denied as an impermissible second motion under MICH. CT. R. 6.502(G)(1).  (*Id.*)  On January 27, 2010, Petitioner filed a motion to reconsider the denial of the December 14, 2009 motion for relief from judgment, alleging for the first time that the motion was based on newly discovered evidence and attaching a purported December 18, 2009 Clark County (Kentucky) Circuit Court order dismissing a case (File #93-F-00137), on which Petitioner's second-offender status was based.  The court directed the prosecutor to respond.  In an order issued May 21, 2010, the court denied the motion, concluding that the alleged newly discovered evidence did not support his motion and failed to show that the charges supporting his second offender status were dismissed.  (*Id.*)

Petitioner sought leave to appeal from the May 21, 2010 order to both the Michigan Court of Appeals and the Michigan Supreme Court.  On September 8, 2010, the Michigan Court of Appeals denied leave to appeal Petitioner's sentencing claim under MICH. CT. R. 6.508(D).  With

respect to the remaining claims, the court of appeals dismissed the appeal as an improper appeal from a successive motion for relief from judgment under MICH. CT. R. 6.502(G). The supreme court denied leave to appeal on March 29, 2011, for failure to demonstrate entitlement to relief under MICH. CT. R. 6.508(D).

Petitioner filed the instant habeas application on or about September 4, 2008.

### Standard of Review

This action is governed by the Antiterrorism and Effective Death Penalty Act, PUB. L. 104-132, 110 STAT. 1214 (AEDPA). *See Penry v. Johnson*, 532 U.S. 782, 792 (2001). The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). The inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent

- 24 -

at the time [the petitioner's] conviction became final." *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001); *see also Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003).

A decision of the state court may only be overturned if (1) it applies a rule that contradicts the governing law set forth by the Supreme Court, (2) it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result; (3) it identifies the correct governing legal rule from the Supreme Court precedent but unreasonably applies it to the facts of the case; or (4) it either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend a principle to a context where it should apply. *Bailey*, 271 F.3d at 655 (citing *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694; *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003). A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *accord Bell*, 535 U.S. at 699. Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Id.* at 410.

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir.

- 25 -

1989). Applying the foregoing standards under the AEDPA, I find that Petitioner is not entitled to relief.

### Discussion

I.    Ground II:  Ineffective Assistance of Trial Counsel

In Ground II of his habeas application, Petitioner argues that his trial attorney should have moved to suppress the statements of Dohner, Sheeler and Hollihan because the prosecutor failed to disclose before trial the details of Dohner's and Sheeler's plea agreements and Hollihan's immunity agreement.  He also argues that his attorney should have sought to exclude Zelmer's testimony because it was the product of illegal police conduct.

In *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel.  To establish a claim of ineffective assistance of counsel, the petitioner must prove:  (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.  The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy. *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).  The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690.  Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the

judgment. *Id.* at 691. Moreover, as the Supreme Court recently has observed, when a federal court

reviews a state court's application of *Strickland* under § 2254(d), the deferential standard of

*Strickland* is "doubly" deferential. *Harrington v. Richter*, 131 S. Ct. 770, 788 (2011) (citing

*Knowles v. Mirzayance*, 556 U.S. 111, 129 S. Ct. 1411, 1420 (2009)); *Premo v. Moore*, 131 S. Ct.

733, 740 (2011). In those circumstances, the question before the habeas court is "whether there is

any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*

  Applying the *Strickland* standard, the Michigan Court of Appeals addressed

Petitioner's challenge to the statements of Dohner, Sheeler and Hollihan as follows:

> The prosecutor has a duty to disclose the details of a witness's plea agreement, immunity agreement, or other agreement for testimony to the defendant and, on request, to the jury. MCR 6.201(B)(5); *People v Cadle*, 204 Mich App 646, 654; 516 NW2d 520 (1994), overruled in part on other grounds by *People v Perry*, 460 Mich 55 (1999). In this case, it is not apparent from the record what information was provided to defendant before trial concerning the witnesses' plea and immunity agreements. However, the witnesses testified at trial regarding their plea and immunity agreements, and defense counsel extensively cross-examined these witnesses about their agreements in relation to their motives for testifying against defendant. The trial court record provides no basis for concluding that defendant was unaware of the witnesses' plea and immunity agreements before trial. Further, the details of the agreements were presented to the jury. Accordingly, any alleged failure by the prosecution to disclose the details of these agreements before trial did not prejudice defendant and deprive him of a fair trial.

(5/22/07 MCOA Op. at 2-3, docket #25.)

  The court of appeals rejected Petitioner's claim solely on the prejudice prong of

*Strickland*. "When deciding ineffective-assistance claims, courts need not address both components

of the inquiry 'if the defendant makes an insufficient showing on one.'" *Campbell v. United States*,

364 F.3d 727, 730 (6th Cir. 2004) (quoting *Strickland*, 466 U.S. at 697). "If it is easier to dispose

of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often

be so, that course should be followed." *Strickland*, 466 U.S. at 697.  The state court's determination of the prejudice issue was patently reasonable.  As detailed in the facts set forth *supra*, Dohner testified on direct examination about his plea agreement to a lesser offense in exchange for his testimony against Petitioner.  (Tr. I at 238.)  On cross-examination, defense counsel extensively cross-examined Dohner about his prior lies to the police, his discussions with Sheeler, and his motivation to lie in court.  (Tr. II at 245-59.)  Petitioner fails to suggest any basis for finding the state court's prejudice determination to be erroneous, much less unreasonable.

Petitioner next argues that Zelmer's testimony should have been suppressed because police learned that Zelmer was a witness to Petitioner's purchase of iodine during the course of a statement taken from Petitioner without benefit of counsel or *Miranda* warnings.  The Michigan Court of Appeals addressed the issue as follows:

> Defendant also argues that his counsel should have moved to exclude Zelmer's testimony because it was the product of illegal police conduct.  However, the only support in the trial court record for defendant's assertion that his disclosure regarding where he purchased the iodine solution occurred during an illegal police interview is found in defendant's self-serving affidavit, which alleges that the prosecutor learned about Zelmer's identity during an interview with defendant in which she had agreed not to use defendant's statements against him.  Defendant fails to provide any independent factual basis to support his claim that this alleged conversation was conducted illegally, or that it even occurred.  "'Defendant may not leave it to this Court to search for a factual basis to sustain or reject his position.'" *People v Traylor*, 245 Mich App 460, 464; 628 NW2d 120 (2001), quoting *People v Norman*, 184 Mich App 255, 260; 457 NW2d 136 (1990).  Because defendant fails to provide more than mere self-serving accusations to support his assertion of error, he fails to establish that his trial counsel was ineffective for failing to move to strike Zelmer's testimony.

(5/22/07 MCOA Op. at 3.)

As previously discussed, a court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable

- 28 -

professional assistance," *Strickland*, 466 U.S. at 689, and Petitioner bears the burden of overcoming that presumption, *id.* The appellate court found that Petitioner wholly failed to produce facts that would undermine the presumption. Indeed, the court found that Petitioner's unsupported arguments did not demonstrate that the interview occurred, that it was conducted illegally or that it was the source of information about Zelmer's identity. As a result, the court found that Petitioner had not overcome the presumption that trial counsel was effective.

The state court's conclusion that Petitioner had failed to provide facts supporting his claim is itself a finding of fact, which is presumed to be correct under the AEDPA absent clear and convincing evidence to the contrary. *See* 28 U.S.C. § 2254(e)(1); *Sumner*, 449 U.S. at 546 (holding that the presumption of correctness is accorded to findings of state appellate courts, as well as findings of the trial court). Petitioner attempts to challenge the state court's finding by referencing a portion of his allocution in the sentencing transcript in which he states, "I talked to Detective Zehm. I told him everything that I could possibly tell. I told him how to catch my brother." (Sent. Tr. at 14, docket #39.)

Petitioner's factual representations fall far short of clear and convincing evidence that would rebut the state court's finding. Instead, the cited portion of the sentencing transcript at best demonstrates that Petitioner at some time talked to Detective Zehm. Nothing in the referenced excerpt suggests that Petitioner's statement to Zehm was uncounseled or involuntary or that the statement revealed Zelmer's identity. As a consequence the state court's finding is presumed to be correct. Accepting that finding, the state court's rejection of Petitioner's claim of ineffective assistance of counsel constitutes a reasonable application of clearly established Supreme Court precedent.

## II.   Ground III: Denial of Fair Trial

In his third ground for habeas relief, Petitioner asserts that the trial court deprived him of a fair trial by improperly admitting other acts evidence, by permitting the prosecutor to commit various acts of misconduct, and by unlawfully scoring Offense Variable (OV) 14 of the sentencing guidelines.  The court of appeals separately addressed each of these issues.

### A.   Other Acts Evidence

Petitioner argued in the state courts as well as this Court that the admission of evidence that he was associated with methamphetamine production at Hollihan's house was both improper under MICH. R. EVID. 404(b) and denied Petitioner a fair trial in violation of the Fourteenth Amendment.  The Michigan Court of Appeals, however, addressed the issue solely as one of state law:

> MRE 404(b) prohibits the admission of other bad acts evidence to prove a person's character, but it permits the admission of this evidence for other purposes, "such as proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident . . . ." Essentially, evidence is admissible if it is offered for something other than a character or propensity theory.  To be admitted, evidence must also be relevant and, pursuant to MRE 403, the probative value of the evidence must not be substantially outweighed by the danger of unfair prejudice.  *People v Knox*, 469 Mich 502, 509-510; 674 NW2d 366 (2004).
>
> The principal issue at trial was whether defendant was involved in the methamphetamine production that occurred at Dohner's and Sheeler's homes. Evidence that defendant helped transport the methamphetamine supplies to Hollihan's house was probative of defendant's knowledge of and involvement in the methamphetamine operation at Dohner's and Sheeler's homes and so was admissible for a non-character purpose.  Specifically, it revealed that defendant engaged in a scheme of befriending individuals with histories of addiction to alcohol and narcotics, introducing or reintroducing them to methamphetamine, and then using their homes to manufacture methamphetamine in exchange for payments of the drug. Further, the evidence was not unduly prejudicial under MRE 403, especially in light of the trial court's cautionary instructions advising the jurors of the limited purpose

- 30 -

of the evidence.  The trial court did not abuse its discretion when it admitted this evidence.

(MCOA Op. at 5.)

The extraordinary remedy of habeas corpus lies only for a violation of the Constitution. 28 U.S.C. § 2254(a).  As the Supreme Court explained in *Estelle v. McGuire*, 502 U.S. 62 (1991), an inquiry whether evidence was properly admitted or improperly excluded under state law "is no part of the federal court's habeas review of a state conviction [for] it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions." *Id.* at 67-68.  Rather, "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Id.* at 68.  State-court evidentiary rulings cannot rise to the level of due process violations unless they offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental. *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quotation omitted); *accord Coleman v. Mitchell*, 268 F.3d 417, 439 (6th Cir. 2001); *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003).

There is no clearly established Supreme Court precedent that holds that a state court violates the Due Process Clause by permitting propensity evidence in the form of other bad acts evidence.  In *Estelle*, the Supreme Court declined to hold that the admission of prior acts evidence violated due process.  502 U.S. at 75.  The Court stated in a footnote that, because it need not reach the issue, it expressed no opinion as to whether a state law would violate due process if it permitted the use of prior crimes evidence to show propensity to commit a charged crime. *Id.* at 75 n.5.  While the Supreme Court has addressed whether prior acts testimony is permissible under the Federal Rules

of Evidence, *see Old Chief v. United States*, 519 U.S. 172 (1997); *Huddleston v. United States*, 485 U.S. 681 (1988), it has not explicitly addressed the issue in constitutional terms.  The Sixth Circuit has also recognized that "[t]here is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence."  *Bugh*, 329 F.3d at 512.

Moreover, Petitioner cannot establish that the trial court's admission of the bad acts evidence rendered his trial fundamentally unfair.  As discussed by the Michigan Court of Appeals, the evidence was relevant to show Petitioner's knowledge of and involvement in a pattern of methamphetamine production, and the trial court carefully instructed the jury about the limited purpose for which the evidence could be used.  The admission of the evidence, therefore, was not fundamentally unfair.  As a result, the Michigan Court of Appeals' decision was neither contrary to nor an unreasonable application of Supreme Court precedent.

## B.    Prosecutorial Misconduct

In Grounds III and IV of his habeas application, Petitioner argues, as he did in the Michigan appellate courts, that the prosecutor committed numerous improper actions amounting to prosecutorial misconduct.  Specifically, Petitioner contends that the prosecutor improperly cross-examined his wife, Tracy Kestner, about an alleged letter not introduced into evidence, in which Petitioner purportedly said that the money he had at the time of his arrest was the tax refund for Stephanie Woodruff, whom Petitioner identified as his wife.  (*See* Attach. H to Pet., Page ID##51-53; *see also* Tr. III at 525-26.)  He also contends that the prosecutor improperly questioned Petitioner

about exercising his right to remain silent,[1] and that the prosecutor engaged in improper closing arguments not based on the facts.

In order for a petitioner to be entitled to habeas relief on the basis of prosecutorial misconduct, the petitioner must demonstrate that the prosecutor's improper conduct "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). "[T]he touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982)). In evaluating the impact of the prosecutor's misconduct, a court must consider the extent to which the claimed misconduct tended to mislead the jury or prejudice the petitioner, whether it was isolated or extensive, and whether the claimed misconduct was deliberate or accidental. *See United States v. Young*, 470 U.S. 1, 11-12 (1985). The court also must consider the strength of the overall proof establishing guilt, whether the conduct was objected to by counsel and whether a curative instruction was given by the court. *See id.* at 12-13 (1985); *Darden*, 477 U.S. at 181-82; *Donnelly*, 416 U.S. at 646-47; *Berger v. United States*, 295 U.S. 78, 84-85 (1935).

Only certain of the prosecutorial misconduct claims were raised on direct appeal. The Michigan Court of Appeals addressed the issues, in relevant part, as follows:

> Defendant argues that the prosecutor committed misconduct when she cross-examined Christopher Kestner and Tracy Kestner. We disagree. Because defendant did not challenge the prosecutor's cross-examinations of these witnesses

---

[1] In his brief on appeal to the Michigan Court of Appeals, Petitioner did not raise his claim regarding the prosecutor's alleged cross-examination about his exercise of the right to remain silent. This portion of Ground IV, therefore, was not raised on direct appeal and therefore was not exhausted on direct appeal. Petitioner's other attempts to exhaust this portion of the claim will be addressed *infra*. I also note that certain portions of the prosecutorial misconduct claim that were presented to the Michigan Court of Appeals are not raised in Petitioner's habeas application. They therefore will not be discussed.

at trial, this issue is unpreserved and our review is limited to plain error affecting defendant's substantial rights.  *People v McLaughlin*, 258 Mich App 635, 645; 672 NW2d 860 (2003).

"The prosecutor's good-faith effort to admit evidence does not constitute misconduct."  *People v Ackerman*, 257 Mich App 434, 448; 669 NW2d 818 (2003). Defendant had approximately $1,400 in cash with him when he was arrested. In a written statement, he claimed that Stephanie Woodruff, a family acquaintance, was his wife and that the $1,400 was from her income tax refund.  When the prosecutor questioned Tracy regarding whether she knew that defendant had referred to Woodruff as his wife, she was not attempting to portray defendant as an adulterer. Instead, she was attempting to challenge Tracy's credibility with respect to her knowledge of defendant's habits and conduct during the relevant time period.  This credibility challenge was relevant because it permitted the jury to determine the reliability of Tracy's claims that defendant primarily spent his time between November 2004 and January 2005 at work or at home with her.

. . .

Further, defendant claims that the prosecutor's closing argument "focused on and injected issues broader than the guilt or innocence of the defendant."  However, defendant does not explain how the referenced portions of the prosecutor's argument raise issues broader than defendant's guilt or innocence, and we do not find that the prosecutor's closing argument was impermissibly broad.  Accordingly, defendant also abandons this issue on appeal, and we will not consider it further.  *Id.*

(MCOA Op. at 5-6.)

With respect to the prosecutor's allegedly improper questioning of Tracy Kestner, the state court found that Petitioner had failed to preserve his claim of error by making a contemporaneous objection.  The court therefore conducted only limited review for plain error.

When a state-law default prevents further state consideration of a federal issue, the federal courts ordinarily are precluded from considering that issue on habeas corpus review.  *See Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991); *Engle v. Isaac*, 456 U.S. 107 (1982).  To determine whether a petitioner procedurally defaulted a federal claim in state court, the Court must consider whether: (1) the petitioner failed to comply with an applicable state procedural rule; (2) the last state

- 34 -

court rendering judgment on the claim at issue actually enforced the state procedural rule so as to bar that claim; and (3) the state procedural default is an "independent and adequate" state ground properly foreclosing federal habeas review of the federal constitutional claim. *See Hicks v. Straub,* 377 F.3d 538, 551 (6th Cir. 2004); *accord Lancaster*, 324 F.3d at 436-37; *Greer v. Mitchell*, 264 F.3d 663, 672 (6th Cir. 2001); *Buell v. Mitchell*, 274 F.3d 337, 348 (6th Cir. 2001). If a petitioner procedurally defaulted his federal claim in state court, the petitioner must demonstrate either (1) cause for his failure to comply with the state procedural rule and actual prejudice flowing from the violation of federal law alleged in his claim, or (2) that a lack of federal habeas review of the claim will result in a fundamental miscarriage of justice. *See House v. Bell*, 547 U.S. 518, 536 (2006); *Murray v. Carrier*, 477 U.S. 478, 495 (1986); *Hicks*, 377 F.3d at 551-52.

The Michigan Court of Appeals expressly relied on Michigan's contemporaneous objection rule in denying Petitioner's claim. It is clear that the contemporaneous objection rule was well-established at the time of Petitioner's trial. *See, e.g.*, *People v. Kelly*, 378 N.W.2d 365, 369-70 (Mich. 1985). Moreover, the Michigan courts regularly applied that rule to claims involving prosecutorial misconduct. *See, e.g.*, *People v. Stanaway*, 521 N.W.2d 557, 579 (Mich. 1994) (citing cases). A rule designed to arm trial judges with the information needed to rule reliably "serves a governmental interest of undoubted legitimacy." *Lee v. Kemna*, 534 U.S. 362, 385 (2002). Further, even though the court of appeals applied a limited review of the claimed error to determine whether it amounted to plain error, Petitioner's failure to object is still considered a procedural default. *See Baze v. Parker*, 371 F.3d 310, 320 (6th Cir. 2004); *Seymour*, 224 F.3d at 557 (citations omitted); *Scott v. Mitchell*, 209 F.3d 854, 866-68 (6th Cir. 2000); *Paprocki v. Foltz*, 869 F.2d 281, 284-85 (6th Cir. 1989). Petitioner's failure to comply with the state's independent and adequate state

- 35 -

procedural rule, *i.e.*, making a contemporaneous objection, caused him to default in state court his claim concerning the questioning of his wife. *See Wainwright v. Sykes*, 433 U.S. 72, 86-88 (1977); *Lancaster*, 324 F.3d at 437; *West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996).

Moreover, even had he not defaulted his claim, the court of appeals conclusion that Petitioner had not demonstrated prosecutorial misconduct in the questioning of Petitioner's wife was a patently reasonable application of established Supreme Court precedent.  As the court of appeals found, the prosecutor's questions were directed at Petitioner's wife's credibility concerning the depth of her knowledge about Petitioner's actions; they were not an attempt to mislead the jury into thinking that Petitioner was an adulterer.  Petitioner's wife disputed the accuracy of the statement and testified unequivocally about Petitioner's devotion as a father and husband.  Moreover, the trial court instructed the jury that only the testimony of the witnesses, not the questions of the lawyers, constituted evidence.  (Tr. III at 528, 615.)  Further, the questions were isolated and collateral to any central issue in the case.  Petitioner wholly fails to demonstrate that the state court's determination about the alleged prosecutorial misconduct was either contrary to or an unreasonable application of established Supreme Court precedent.

Petitioner's claim that the prosecutor made improper closing arguments is also procedurally defaulted.  The court of appeals rejected the claim on the procedural ground that Petitioner had failed to elaborate his argument on appeal, thereby abandoning it.  (MCOA Op. at 6 (citing *Mitchum v. Detroit*, 94 N.W.2d 388, 399 (Mich. 1959)).  The Michigan courts have long and regularly enforced the rule set forth in *Mitchum*:

> It is not enough for an appellant in his brief simply to announce a position or assert an error and then leave it up to this Court to discover and rationalize the basis for his

claims, or unravel and elaborate for him his arguments, and then search for authority either to sustain or reject his position.

*Id.  See, e.g., Ziegler v. Warden*, 607 N.W.2d 59 (Mich. 2000); *Mudge v. Macomb County*, 580 N.W.2d 845, 854 (Mich. 1998); *People v. Bean*, 580 N.W.2d 390, 393 (Mich. 1998); *Wilson v. Taylor*, 577 N.W.2d 100, 105 (Mich. 1998); *People v. Waclawski*, 780 N.W.2d 321, 352 (Mich. Ct. App. 2009); *People v. Martin*, 721 N.W.2d 815, 840 (Mich. Ct. App. 2006); *L.M.E. v. A.R.S.*, 680 N.W.2d 902, 906 (Mich. Ct. App. 2004).  The record also supports the state court's finding that Petitioner failed to develop his claim.  Because Petitioner failed to comply with an independent and adequate state procedural rule and the court rejected his claim under that rule, his claim is procedurally defaulted.

Petitioner therefore must demonstrate either (1) cause for his failure to comply with the state procedural rule and actual prejudice flowing from the violation of federal law alleged in his claim, or (2) that a lack of federal habeas review of the claim will result in a fundamental miscarriage of justice.  *See House*, 547 U.S. at 536; *Murray*, 477 U.S. at  495; *Hicks*, 377 F.3d at 551-52.  The miscarriage-of-justice exception only can be met in an "extraordinary" case where a prisoner asserts a claim of actual innocence based upon new reliable evidence.  *House*, 547 U.S. at 536. A habeas petitioner asserting a claim of actual innocence must establish that, in light of new evidence, it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.  *Id.* (citing *Schlup v. Delo*, 513 U.S. 298, 327 (1995)).

Petitioner has made no attempt to show cause and prejudice excusing his procedural default or actual innocence.  In his motion for relief from judgment, Petitioner raised the ineffective assistance of appellate counsel as cause excusing his failure to present various issues on direct

appeal.  However, at no time did Petitioner suggest that appellate counsel was ineffective for abandoning this issue on appeal.  Moreover, a review of the closing argument fails to demonstrate the existence of prejudice from any improper comment.  Accordingly, Petitioner's claim of prosecutorial misconduct in closing arguments is not reviewable in this proceeding as it is procedurally defaulted.[2]

### C.    Sentence Scoring

Also in Ground III of the petition, Petitioner argues that he was denied fundamental fairness when the Court scored ten points on OV 14, finding that Petitioner was a leader in a multiple-offender situation.  Claims concerning the improper scoring of sentencing guidelines are state-law claims and typically are not cognizable in habeas corpus proceedings. *See Hutto v. Davis*, 454 U.S. 370, 373-74 (1982) (federal courts normally do not review a sentence for a term of years that falls within the limits prescribed by the state legislature); *Austin v. Jackson*, 213 F.3d 298, 301-02 (6th Cir. 2000) (alleged violation of state law with respect to sentencing is not subject to federal habeas relief);  *Cook v. Stegall*, 56 F. Supp. 2d 788, 797 (E.D. Mich. 1999) (the sentencing guidelines establish only rules of state law).  There is no constitutional right to individualized sentencing in non-capital cases. *Harmelin v. Michigan*, 501 U.S. 957, 995 (1991); *United States v. Thomas*, 49 F.3d 253, 261 (6th Cir. 1995); *see also Lockett v. Ohio*, 438 U.S. 586, 604-05 (1978) (in a case holding that mitigating factors must be fully considered in death penalty cases, the Court "recognize[d] that, in noncapital cases, the established practice of individualized sentences rests not

---

[2] The Court notes that Petitioner did not argue on direct appeal that the prosecutor had committed misconduct by engaging Petitioner in an improper line of questioning referencing his decision to exercise his right to remain silent. He raised that issue for the first and only time in his first motion for relief from judgment.  As discussed *infra* in Section III(A) of this Report and Recommendation, Petitioner failed to exhaust any claim presented in his first motion for relief from judgment.

on constitutional commands, but on public policy enacted into statutes."). Since Petitioner has no

federal right to an individualized sentence, this ground presents an issue of state law only.  Petitioner

has not alleged grounds for the Court to conclude that this is one of those rare instances where an

alleged state-law sentencing error was so egregious that it led to a fundamentally unfair outcome.

*See Koras v. Robinson,* 123 F. App'x 207, 213 (6th Cir. 2005) (citing *Bowling v. Parker*, 344 F.3d

487, 521 (6th Cir. 2003)).   As a consequence, Petitioner is not entitled to habeas relief on his

sentence-scoring claim.

III.     Grounds IV[3], V, VI, VII, VIII, IX, X, XI, XII, XIV & XV:
         Exhaustion and Procedural Default

Most of Petitioner's remaining claims were not raised on direct appeal, but instead

were presented in three successive motions for relief from judgment under MICH. CT. R. 6.500 *et seq.*

However, under Michigan law effective August 1, 1995, a defendant is permitted to file only one

motion for relief from judgment under M.C.R. 6.500, absent a retroactive change in the law or newly

discovered evidence.   *See* M.C.R. 6.502(G)(1), (2).   It appears that most of Petitioner's remaining

claims were not properly exhausted in the Michigan courts and are now procedurally defaulted.

Before the court may grant habeas relief to a state prisoner, the prisoner must exhaust

remedies available in the state courts.  28 U.S.C. § 2254(b)(1); *O'Sullivan v. Boerckel*, 526 U.S. 838,

842 (1999).  Exhaustion requires a petitioner to "fairly present" federal claims so that state courts

have a "fair opportunity" to apply controlling legal principles to the facts bearing upon a petitioner's

constitutional claim.  *See O'Sullivan*, 526 U.S. at 842; *Picard v. Connor*, 404 U.S. 270, 275-77

(1971) (cited by *Duncan v. Henry*, 513 U.S. 364, 365 (1995) and *Anderson v. Harless*, 459 U.S. 4,

---

[3]A portion of Ground IV was raised on direct appeal and was previously discussed, *supra*.  The instant
discussion relates solely to that portion of Ground IV that was not presented on direct appeal.

6 (1982)).  To fulfill the exhaustion requirement, a petitioner must have fairly presented his federal claims to all levels of the state appellate system, including the state's highest court.  *Duncan*, 513 U.S. at 365-66; *Wagner v. Smith*, 581 F.3d 410, 414 (6th Cir. 2009); *Hafley v. Sowders*, 902 F.2d 480, 483 (6th Cir. 1990).  "[S]tate prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process."  *O'Sullivan*, 526 U.S. at 845.

An applicant has not exhausted available state remedies if he has the right under state law to raise, by any available procedure, the question presented.  28 U.S.C. § 2254(c).  Exhaustion is only a problem, however, if there is a state court remedy available for petitioner to pursue, thus providing the state courts with an opportunity to cure any constitutional infirmities in the state court conviction.  *Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994).  If no further state remedy is available to the petitioner, exhaustion is no longer an issue, but the claim is procedurally defaulted, and the federal court must determine whether cause and prejudice exists to excuse the failure to present the claim in state court.  *Id.*

### A.    First Motion for Relief from Judgment

Petitioner raised habeas Grounds IV, V, VI, VII, VIII, IX, X, XI, XII and XIV[4] in his first motion for relief from judgment filed on March 17, 2008.  The Berrien County Circuit Court concluded that Petitioner was not entitled to relief from judgment because he had failed to raise his claims on direct appeal and had failed to meet the requirements of MICH. CT. R. 6.508(D)(3) by demonstrating either good cause for that failure and actual prejudice therefrom or by demonstrating

---

[4]Although habeas Ground XIV was not technically raised until Petitioner's third motion for relief from judgment, the substance of the claim is substantially consistent with Ground V, which was raised in Petitioner's first motion for relief from judgment.

actual innocence.  (*See* 4/30/08 Cir. Ct. Ord. at 4, docket #69.)   The court later denied reconsideration. (*See* 6/19/08 Cir. Ct. Ord., Page ID##39-42.) Petitioner did not seek leave to appeal the denial in either the Michigan Court of Appeals or the Michigan Supreme Court.  As a result, habeas Grounds IV, V, VI, VII, VIII, IX, X, XI, XII and XIV were not exhausted by Petitioner's first motion for relief from judgment because they were not fairly presented to all levels of the state appellate courts.  *O'Sullivan*, 526 U.S. at 842.  Because Petitioner has no remaining available state court remedies, *see* MICH. CT. R. 6.502(G), the claims raised in his motion for relief from judgment must be considered procedurally defaulted.  *Rust*, 17 F.3d at 160.

At this juncture, the Court must consider whether there exists cause and prejudice excusing Petitioner's failure to present the claims in the state appellate courts.  *See Gray v. Netherland*, 518 U.S. 152, 161-62 (1996); *Rust*, 17 F.3d at 160.  To show cause sufficient to excuse a failure to raise claims on direct appeal, Petitioner must point to "some objective factor external to the defense" that prevented him from raising the issue in his first appeal.  *Murray*, 477 U.S. at 488; *see McCleskey v. Zant*, 499 U.S. 467, 497 (1991). "A petitioner who fails to demonstrate cause and prejudice cannot have a cognizable claim.  *Gray*, 518 U.S. at 162.  Further, where a petitioner fails to show cause, the Court need not consider whether he has established prejudice.  *See Engle*, 456 U.S. at 134 n.43; *Leroy v. Marshall*, 757 F.2d 94, 100 (6th Cir. 1985).

In Ground XI of his petition, as in his motion for relief from judgment, Petitioner raises the ineffective assistance of appellate counsel as cause excusing his failure to raise his unexhausted claims on direct appeal.  To serve as cause excusing a procedural default, a claim of ineffective assistance of counsel must itself be properly exhausted. *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000); *Buell*,  274 F.3d at 349; *Coleman v. Mitchell*, 244 F.3d 533, 538 (6th Cir. 2001).

Petitioner, however, raised his claim of ineffective assistance of counsel only in his first motion for relief from judgment in the circuit court – not in an application for leave to appeal to either the court of appeals or the supreme court.  As a consequence, Petitioner's claim of ineffective assistance of appellate counsel was not fairly presented to all levels of the Michigan appellate courts.  *O'Sullivan*, 526 U.S. at 842.  It therefore is not exhausted and may not serve as cause excusing his procedural default.  *Edwards*, 529 U.S. at 453.

Moreover, even if his claim of ineffective assistance of appellate counsel had been exhausted, the claim would not serve to excuse his procedural default, because it is without merit. The Supreme Court applies the same two-pronged test to claims of ineffective assistance of appellate counsel as to claims of ineffective assistance of trial counsel.  *See Strickland*, 466 U.S. at 688. Under the *Strickland* standard, a petitioner must prove:  (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome.  *Id.*  An appellant has no constitutional right to have every non-frivolous issue raised on appeal.  "'[W]innowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy."  *Smith v. Murray*, 477 U.S. 527, 536 (1986) (quoting *Jones v. Barnes*, 463 U.S. 745, 751-52 (1983)).  To require appellate counsel to raise every possible colorable issue "would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions."  *Strickland*, 466 U.S. at 688.  The Supreme Court has recognized that it is difficult to demonstrate that an appellate attorney has violated the performance prong where the attorney presents one argument on appeal rather than another.  *Smith v. Robbins*, 528 U.S. 259, 289 (2000).  In such cases, the petitioner

must demonstrate that the issue not presented "was clearly stronger than issues that counsel did present." *Id.* at 289.  Moreover, when on habeas review the federal court reviews a state court's application of the highly deferential standard of *Strickland*, the question before the habeas court is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington*, 131 S. Ct. at 788.

Applying the *Strickland* standard, the trial court expressly rejected Petitioner's claim of ineffective assistance of appellate counsel, finding that Petitioner had failed to overcome the presumption that appellate counsel's performance was objectively reasonable and strategic.  (4/30/08 Cir. Ct. Ord., Page ID##44-46.)  The court noted that Petitioner's first appellate attorney raised four issues on appeal and that his substitute attorneys had been permitted to file a second, supplemental appellate brief containing five issues.  At the time the second brief was filed, the State Appellate Defender Office was well aware of the issues Petitioner wished to raise in his supplemental brief on appeal, including the alleged conflict of interest of trial counsel set forth in Grounds V and XIV of the habeas petition.  Yet appellate counsel elected not to include those issues in the supplemental brief on appeal.  As the trial court recognized, those circumstances strongly support the presumption that appellate counsel's determination was strategic.  (*Id.*, Page ID#45.)  Moreover, the trial court rejected Petitioner's principal claim on collateral review – that trial counsel had an actual conflict of interest that prejudiced Petitioner:

> Defendant has failed to show that an actual conflict of interest existed that affected his trial attorney's performance.  After reviewing the trial transcripts, it is apparent that Defendant's trial attorney vigorously defended the case, conducted ample direct and cross examination of all of the witnesses, made successful objections, and otherwise conducted the trial adequately.  The only potential conflict that Defendant points to as affecting his attorney's performance is Mr. Berger's representation of Defendant's brother, Chris.  Chris pled guilty to manufacturing

methamphetamines and maintaining a meth lab, both as first time offenses. Defendant's theory of the case, that Chris was behind everything and he had nothing to do with it, was directly in line with Chris's testimony and guilty plea.  A potential conflict may have arisen if Defendant and Chris each said the other was behind it all. Instead, they both said that Chris made and sold the methamphetamines, not Defendant.  The jury had an opportunity to hear this from both Defendant and Chris, but ultimately rejected it.  Because Petitioner has failed to show that he was actually prejudiced by his trial counsel's performance, his appellate counsel could not have been ineffective for not raising the issue on appeal.

. . .

Because Defendant has failed to show that he appellate counsel provided ineffective assistance for failing to raise the conflict of interest issue, Defendant's Motion for Relief from Judgment is **DENIED**.

(4/30/08 Cir. Ct. Ord., Page ID#46.)

The state court's determination was patently reasonable.  Notwithstanding Petitioner's hyperbolic language, appellate counsel unquestionably provided effective assistance of counsel. Counsel presented and fully developed numerous issues on appeal.  Petitioner wholly fails to overcome the doubly deferential standard of *Strickland*.  *See Harrington*, 131 S. Ct. at 788.

Because Petitioner's claim of ineffective assistance of appellate counsel is both procedurally defaulted and without merit, the remaining claims raised in Petitioner's first motion for relief from judgment are procedurally defaulted.

**B.      Second Motion for Relief from Judgment**

Petitioner filed a second motion for relief from a void judgment on October 6, 2009, raising a challenge to the court's jurisdiction, which presumably corresponds to habeas Ground XII. Apparently not recognizing that the motion was Petitioner's second motion for relief from judgment, the trial court summarily denied the motion, but not on the basis that it was an improper second motion under MICH. CT. R. 6.502(G)(1).  Petitioner did not seek leave to appeal the denial of his

second motion to either the court of appeals or the supreme court. As a consequence, the second motion for relief from judgment failed to exhaust any claim for relief, because it did not fairly present any issue to all levels of the Michigan courts. *O'Sullivan*, 526 U.S. at 842. The claims raised in the second motion for relief from judgment therefore are defaulted, and Petitioner has made no attempt to show cause and prejudice or actual innocence excusing the default.

### C.      Third Motion for Relief from Judgment

On December 19, 2009, Petitioner filed a third motion for relief from judgment, raising the three claims now presented as habeas grounds XIII, XIV, and XV: (1) whether Petitioner's sentence was based on false information about a prior felony drug conviction; (2) whether trial counsel abandoned Petitioner at critical stages of the proceedings while operating under a conflict of interest; and (3) whether Petitioner was denied the effective assistance of appellate counsel by counsel's misrepresentation of facts on appeal, pursuit of frivolous claims, and failure to raise meritorious claims. The court denied the motion for relief from judgment on January 14, 2010, because it was an improper second motion under MICH. CT. R. 6.502(G)(1).

Petitioner moved for reconsideration on January 27, 2010, alleging for the first time that his sentencing claim was based on newly discovered evidence and attaching a December 18, 2009 order from the Clark County (Kentucky) Circuit Court dismissing a 1993 case. On the basis of Petitioner's motion, the court directed the prosecution to file a response to the order on February 22, 2010. After receiving the response on May 21, 2010, the court immediately concluded that an evidentiary hearing was not necessary and issued an order holding that the alleged newly discovered evidence failed to show that the charges on which his second-offender status were based were

dismissed.  The court therefore concluded that its January 14, 2010 order denying relief from judgment was proper.  (5/21/10 Cir. Ct. Ord., docket #69.)

Petitioner sought leave to appeal the May 21, 2010 order to the Michigan Court of Appeals.  In an order issued September 8, 2010, the Michigan Court of Appeals denied leave to appeal Petitioner's first claim of sentencing error based on newly discovered evidence on the basis that Petitioner had failed to meet the burden of establishing entitlement to relief under MICH. CT. R. 6.508(D).  (9/8/10 MCOA Ord., docket #69.)  Petitioner's remaining claims of error were dismissed as an improper appeal of a successive motion for relief from judgment under MICH. CT. R. 6.502(G).  Petitioner sought leave to appeal to the Michigan Supreme Court, which denied leave to appeal on March 29, 2011, on the ground that Petitioner had failed to demonstrate entitlement to relief under MICH. CT. R. 6.508(D).  (3/29/11 Mich. Ord., docket #69.)

On the basis of this history, the claims raised in Petitioner's fourteenth and fifteenth grounds for habeas relief are procedurally defaulted.  Both the trial court and the court of appeals dismissed those grounds of Petitioner's December 14, 2009 motion for relief from judgment as an improper second motion for relief from judgment under MICH. CT. R. 6.502(G).  The rule barring the filing of a second motion for relief from judgment was an independent and adequate state procedural rule regularly followed since 1995.  Petitioner unquestionably violated that rule by filing not only a second but also a third motion for relief from judgment.

As a result, in order to proceed with his fourteenth and fifteenth grounds for habeas relief, Petitioner must show either cause and prejudice excusing the default or actual innocence.  Petitioner makes no attempt to demonstrate actual innocence.  As cause for his default, Petitioner argues that his trial attorney was ineffective in investigating and challenging one of Petitioner's

underlying felonies, and that appellate counsel was ineffective in challenging both the sentence and trial counsel's performance.

Petitioner's argument regarding cause, however, does not either explain or excuse his default of Grounds XIV and XV.  Petitioner raised habeas Ground XIV, challenging his trial attorney's alleged conflict of interest, in his first motion for relief from judgment.  As previously discussed, however, the claim was not exhausted through all levels of the state appellate courts. Petitioner offers no explanation that could serve as cause excusing his failure to fully exhaust Ground XIV by appealing the denial of his first motion.  At that point, Petitioner was proceeding *in pro per* and therefore cannot blame counsel for the failure to appeal.  Moreover, as I previously concluded the trial court's rejection of the claim constituted a reasonable application of established precedent.  Petitioner did not raise Ground XV of his habeas petition until his third motion for relief from judgment.  He offers no explanation for his failure to raise the issue in his first two motions for relief from judgment.  He therefore fails entirely to demonstrate cause excusing his default.

IV.    Ground XIII:  Sentencing Based on Inaccurate Information

Petitioner's thirteenth ground for habeas relief was raised for the first time in his third motion for relief from judgment, alleging that, based on newly discovered evidence, his sentence was enhanced based on a 1993 conviction that was ultimately dismissed in 2009.  Petitioner therefore contends that he was sentenced on the basis of inaccurate information.[5]

---

[5] Petitioner raised on direct appeal a different claim regarding his due process right to be sentenced on the basis of accurate information, which also involved a challenge to his 1993 Kentucky conviction.  On direct appeal, Petitioner argued that his sentence was enhanced on the basis of the 1993 conviction, which, he alleged, was an uncounseled conviction.  The state court rejected Petitioner's claim, denying him a hearing on the issue because he had failed to present prima facie evidence that the conviction was uncounseled or that he had requested the Kentucky records and been denied them.  (5/22/07 MCOA Op. at 6-7, docket #25.)

A sentence may violate due process if it is based upon "material misinformation of constitutional magnitude." *Roberts v. United States,* 445 U.S. 552, 556 (1980)); *see also United States v. Tucker,* 404 U.S. 443, 447 (1972); *Townsend v. Burke,* 334 U.S. 736, 741 (1948). To prevail on such a claim, the petitioner must show (1) that the information before the sentencing court was materially false, and (2) that the court relied on the false information in imposing the sentence. *Tucker,* 404 U.S. at 447. A sentencing court demonstrates actual reliance on misinformation when the court gives "explicit attention" to it, "found[s]" its sentence "at least in part" on it, or gives "specific consideration" to the information before imposing sentence. *Tucker,* 404 U.S. at 447.

Reviewing the evidence presented by Petitioner and the response of the prosecutor, the trial court found that Petitioner had failed to demonstrate that the information before the sentencing court was inaccurate, stating:

> THE COURT FURTHER FINDS that the alleged newly discovered evidence provided by [Petitioner] does not support his motion and fails to show that the charges on which his second-offender status are based were dismissed.

(5/21/10 Cir. Ct. Ord., docket #69.) Under the AEDPA, a determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656.

Petitioner has wholly failed to rebut that presumption. Indeed, the finding is strongly supported by Petitioner's own evidence. Petitioner's maximum prison terms were increased from 20 to 40 years because the meth convictions were considered second or subsequent narcotic drug offenses within the meaning of MICH. COMP. LAWS § 333.7413(5). Under that statute, "an offense is considered a second or subsequent offense, if, before conviction of the offense, the offender has

- 48 -

at any time been convicted under this article or under any statute of the United States of any state relating to a narcotic drug, marihuana, depressant, stimulant, or hallucinogenic drug." *Id.* Petitioner contends that he was not convicted of the 1993 Kentucky drug offense listed on the Presentence Investigation Report, trafficking in marijuana of 8 ounces to less than 5 pounds. He attaches to his supplemental petition a copy of his Presentence Investigation Report (Page ID##951-67), a Clark County (Kentucky) district court docket sheet showing a conviction of marijuana trafficking of less than 8 ounces (Page ID##1104-05), and a Clark County (Kentucky) Circuit Court order dated December 18, 2009 (Page ID#1106). None of these documents suggests or shows that Petitioner had no prior offense relating to any controlled substance. Indeed, the district court docket sheet amply demonstrates that Petitioner was found guilty of an offense related to marijuana within the meaning of MICH. COMP. LAWS § 333.7413. The circuit court order of dismissal relates to a case number that had been opened in circuit court before the matter was resolved in district court and that had never been closed. The order does not suggest that the 1993 district court conviction was dismissed. As a consequence, the evidence submitted by Petitioner falls far short of the clear and convincing evidence required to rebut the state court's factual finding.

### V.   Ground I:  Denial of Evidentiary Hearing

In his first ground for habeas relief, Petitioner argues that he was denied numerous requests for evidentiary hearings during the course of his direct appeal, ostensibly in violation of his rights to present a defense, equal protection and due process. Petitioner argues that he should have been granted a remand for a hearing regarding the ineffective assistance of trial counsel, the ineffective assistance of appellate counsel, and misconduct by the prosecutor. He requests an evidentiary hearing in this Court on those matters.

Following enactment of the AEDPA, federal habeas courts have limited discretion to take new evidence in an evidentiary hearing. *See Cullen v. Pinholster*, 131 S. Ct. 1388, 1400-01 (2011); *see also Sheppard v. Bagley*, 657 F.3d 338, 343 (6th Cir. 2011). Under 28 U.S.C. § 2254(e)(2), if an applicant has failed to develop a record in state court, a federal court on habeas review may grant a hearing only when the petitioner can demonstrate both of the following:

(A)     the claim relies on

(i)     a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

(ii)     a factual predicate that could not have been previously discovered through the exercise of due diligence; and

(B)     the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

*Id.* Moreover, where the issue was adjudicated the issue on the merits in the state court proceedings, the Supreme Court has held that federal habeas corpus "review under § 2254(d)(1) is limited to the record that was before the state court . . . ." *Pinholster*, 131 S. Ct. at 1398. In such circumstances, a federal habeas court is barred from holding an evidentiary hearing. *Id.*

Here, the Michigan courts adjudicated on the merits all of Petitioner's claims for which he seeks an evidentiary hearing. On direct appeal, the Michigan Court of Appeals addressed and rejected Petitioner's claims of ineffective assistance of trial counsel and prosecutorial misconduct on the merits. In its order denying Petitioner's first motion for relief from judgment, the Berrien County Circuit Court rejected Petitioner's claim of ineffective assistance of appellate counsel and his new claim of ineffective assistance of trial counsel. The state courts' determinations of these

claims were patently reasonable under § 2254(d).   Petitioner therefore fails to demonstrate entitlement to an evidentiary hearing.

### **Recommended Disposition**

For the foregoing reasons, I recommend that the habeas corpus petition be denied.


Dated:   December 29, 2011                         /s/  Joseph G. Scoville
                                                                    United States Magistrate Judge


### **NOTICE TO PARTIES**

Any objections to this Report and Recommendation must be filed and served within 14 days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).